T.C. Memo. 2006-125

UNITED STATES TAX COURT

TIMOTHY J. AND JOAN M. MILLER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13635-01.                    Filed June 15, 2006.

<u>Brett J. Miller</u>, for petitioners.

<u>Timothy A. Lohrstorfer</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, <u>Judge</u>:  Respondent determined the following
deficiencies with respect to petitioners' Federal income taxes:

| Tax Year | Deficiency |
|----------|-----------|
| 1989 | $94,685 |
| 1991 | $23,230 |
| 1992 | $70,009 |
| 1993 | $38,083 |
| 1994 | $23,718 |
| 1995 | $6,039 |

After concessions, the issues for decision are:

1.  Whether petitioners had sufficient basis under section 1366(d)(1)(B)[1] with respect to certain indebtedness incurred to fund the operations of Miller Medical Systems, Inc. (MMS), an S corporation in which petitioner Timothy J. Miller was a shareholder, to entitle them to deduct MMS's losses of $750,000 in 1992, $431,691 in 1993, and $189,845 in 1994, which led to net operating loss carryback deductions in 1989, 1990, and 1991, as well as net operating loss carryover deductions of $238,293 for 1994 and $206,178 for 1995.  We hold petitioners had sufficient basis to deduct the aforementioned losses.

2.  Whether petitioners were "at risk" within the meaning of section 465 with respect to the aforementioned indebtedness at

---

[1]  All section references are to the Internal Revenue Code of 1986, as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

the close of taxable years 1992, 1993, and 1994.  We hold that petitioners were "at risk" for this purpose.

3(a).  Whether petitioners had discharge of indebtedness income under section 61(a)(12) of $900,000 in 1994, upon the satisfaction by guarantors of the aforementioned indebtedness to that extent.  We hold that they did.

3(b).  Whether the $900,000 of discharge of indebtedness income is excludable under the insolvency exception of section 108(a)(1)(B).  We hold that it is.

3(c).  Whether certain tax attributes of petitioners, including a net operating loss, net operating loss carryover, net capital loss, and capital loss carryover for 1994 must be reduced under section 108(b)(1) and (2).  We hold that they must.

## FINDINGS OF FACT

The parties have stipulated some of the facts, which are incorporated herein by this reference.  Petitioners, Timothy J. and Joan M. Miller,[2] resided in Indiana at the time the petition was filed.

MMS's Initial Years

Petitioner incorporated MMS in November 1988 and was initially its sole shareholder.  MMS was an S corporation for

---

[2] Joan M. Miller is a petitioner in this case as a result of filing joint returns with petitioner Timothy J. Miller for the years in issue.  As the transactions at issue involved Mr. Miller only, we shall hereinafter use "petitioner" when referring to Mr. Miller individually.

Federal income tax purposes at all relevant times. MMS was in the business of manufacturing mobile and modular medical diagnostic facilities. Shortly after its creation, MMS established a relationship with Huntington National Bank (Huntington) to obtain financing for its business activities. Huntington's loans to MMS were initially on a short-term, "per project" basis; i.e., funds were lent on the basis of the contracts MMS obtained for the construction of diagnostic facilities, to be repaid upon the completion of construction when MMS was paid.

MMS experienced losses from its inception in 1988 through 1994. In February 1992, petitioner obtained four outside investors in MMS: George F. Rapp, James D. Rapp, John G. Rapp, and Gary L. Light (the Rapp Group). The Rapp Group made capital contributions to MMS of $800,000 in the aggregate in exchange for approximately 15 percent of MMS's stock. As a condition for the Rapp Group's investment, MMS was obligated to secure a commitment for a $1 million line of credit. MMS did so through Huntington, which extended a $1 million revolving line of credit to MMS on March 31, 1992 (the MMS/Huntington Loan[3]).

---

[3] The parties to the MMS/Huntington Loan executed a loan agreement, security agreement, and promissory note. Except as otherwise indicated, reference to the MMS/Huntington Loan encompasses all three of the foregoing documents.

Under the MMS/Huntington Loan line of credit, MMS was allowed advances of up to $250,000 per modular or mobile diagnostic unit under contract. Interest at a rate of one-half point above Huntington's prime rate was payable monthly on the outstanding principal advanced. MMS executed a promissory note and granted Huntington a first security interest in MMS's accounts, inventory, equipment, fixtures, and receivables as security for the MMS/Huntington Loan. In addition, petitioner executed an unlimited guaranty for MMS's indebtedness, secured by a second mortgage on his personal residence, and each member of the Rapp Group executed limited guaranties which in the aggregate were equal to the entire $1 million authorized indebtedness. The Rapp Group guaranties were collateralized with shares of Danek Group, Inc. (Danek), a publicly traded stock with an aggregate value that exceeded $1,000,000 when the MMS/Huntington Loan was executed.

MMS's annual operating losses accumulated, and petitioner had insufficient basis in the corporation to deduct them currently. As of December 31, 1991, petitioner had suspended net operating loss deductions from MMS as follows:

```
Suspended net operating loss from 1990    $540,506
Suspended net operating loss from 1991      87,322
                          Total            627,828
```

By late 1992, it was apparent that MMS's operations for that year would also show a loss.[4]

The Loan Restructuring

In December 1992, personnel of MMS had discussions with Huntington concerning the tax benefits of reissuing the line of credit in the MMS/Huntington Loan to petitioner personally.  On December 17, 1992, petitioner's tax adviser at Ernst & Young sent a letter to Huntington explaining that petitioner did not have sufficient basis to deduct his share of MMS's losses because of his status as a mere guarantor of the MMS/Huntington Loan.  The letter therefore proposed that the line of credit be reissued to petitioner personally, with MMS as guarantor, using the same terms and conditions.  Huntington would then lend $750,000 (the then-outstanding principal balance on the MMS/Huntington Loan) to petitioner and petitioner would make a $750,000 cash contribution to MMS, which MMS would use to repay the MMS/Huntington Loan. The letter concluded by emphasizing that the new credit line would need to be established before the end of the year to enable petitioner to deduct his share of MMS's losses for 1992.

In response, Huntington agreed to reissue the line of credit to petitioner personally with essentially the same terms and conditions (including the Rapp Group guaranties) as the

---

[4] In fact, MMS ultimately reported a 1992 net operating loss for Federal income tax purposes of $736,237.

MMS/Huntington Loan, with certain additional conditions. First, all funds drawn by petitioner on the personal line of credit were required to be deposited into a restricted account in petitioner's name at the bank, all withdrawals from the restricted account were required to go into an account at the bank maintained by MMS, and petitioner would be required to warrant that all draws on the personal line of credit would be used exclusively for MMS's construction costs for diagnostic units under contract. Second, rather than petitioner's making cash contributions to MMS, petitioner would extend a $1 million line of credit to MMS (to be funded by petitioner's line of credit with Huntington) for which MMS would execute a promissory note and security agreement in favor of petitioner. MMS would provide as security for the line of credit to it from petitioner the same collateral as had secured MMS's original line of credit from Huntington. Finally, rather than have MMS serve as guarantor with respect to the line of credit extended by Huntington to petitioner, petitioner would instead make a collateral assignment to Huntington of all of petitioner's rights under the security agreement given to petitioner by MMS for the line of credit running between them, as well as a collateral assignment of the promissory note executed by MMS in favor of petitioner.

The restructuring of the line of credit was undertaken on December 30, 1992. On that date, Huntington extended a $1 million revolving line of credit to petitioner personally (the Miller/Huntington Loan) on a full recourse basis. To evidence the indebtedness, petitioner personally executed a loan agreement, security agreement, and full recourse promissory note in favor of Huntington.[5] On the same day, petitioner extended a $1 million revolving line of credit to MMS (the MMS/Miller Loan). To evidence the indebtedness, MMS executed a loan agreement, security agreement, and promissory note in favor of petitioner.[6] Petitioner drew down $750,000 of his credit line under the Miller/Huntington Loan, lent it to MMS pursuant to the MMS/Miller Loan, and MMS in turn used the proceeds to pay the outstanding balance of the MMS/Huntington Loan. On its records, Huntington recorded the MMS/Huntington Loan as satisfied in full by virtue of a $750,000 principal payment on December 30, 1992.

Both the Miller/Huntington and MMS/Miller Loans were due on December 31, 1993, and carried the same interest rate as the MMS/Huntington Loan (one-half point above Huntington's prime rate), with interest payable monthly and advance payments of principal permitted. The Miller/Huntington and MMS/Miller Loans

---

[5] Unless otherwise indicated, reference to the Miller/Huntington Loan encompasses all three of these documents.

[6] Unless otherwise indicated, reference to the MMS/Miller Loan encompasses all three of these documents.

contained the same limitation on advances as in the MMS/Huntington Loan; namely, advances could be made from Huntington to petitioner, and from petitioner to MMS, only with respect to a maximum of $250,000 to cover MMS's construction costs for diagnostic facilities under contract. Pursuant to the conditions imposed by Huntington in agreeing to restructure the line of credit, the advances to petitioner under the Miller/Huntington Loan were deposited into a restricted account in petitioner's name for transfer to MMS. Similarly, when MMS made a payment with respect to its obligation to petitioner under the MMS/Miller Loan, such payment was required to be deposited by petitioner into a restricted account and held in trust for Huntington.

As security for the MMS/Miller Loan, MMS granted petitioner a security interest in the same collateral that had secured the MMS/Huntington Loan; namely, all of its assets, including equipment, inventory, accounts receivable, etc. In the security agreement for the Miller/Huntington Loan, petitioner made a collateral assignment to Huntington of all of his rights under the MMS/Miller Loan, including the promissory note executed in his favor by MMS. With respect to the promissory note, the Miller/Huntington Loan security agreement provided as follows:

> Timothy J. Miller ("Debtor") * * * hereby grants, pledges and assigns to The Huntington National Bank of

Indiana ("Bank"), a security interest in the following property * * * :

      *       *       *       *       *       *       *

(b)   All of Debtor's rights in, to, and under a certain Commercial Loan Note executed by Miller Medical Systems, Inc. on or about December 30, 1992 [i.e., the MMS/Miller promissory note];

      *       *       *       *       *       *       *

The security interest hereby granted is to secure the prompt and full payment and complete performance of all Obligations of Debtor to Bank.

The foregoing security interest in MMS's promissory note was also described in the loan agreement for the Miller/Huntington Loan as follows:

As security for the Loan, * * * [petitioner] shall make a collateral assignment of all * * * [petitioner's] rights and interests arising under or in connection with the * * * [MMS/Miller Loan], including but not limited to, * * * a pledge of any and all promissory notes executed by * * * [MMS] in favor of * * * [petitioner] * * * .

Huntington filed a Uniform Commercial Code financing statement on December 31, 1992, to perfect a security interest in the property petitioner had collaterally assigned to it pursuant to the Miller/Huntington Loan, including the "Commercial Loan Note executed by Miller Medical Systems, Inc. on or about December 30, 1992".

Petitioner also granted Huntington a second mortgage in his personal residence as security for his obligations under the Miller/Huntington Loan.

As with the MMS/Huntington Loan, the Rapp Group members provided limited guaranties with respect to the Miller/Huntington Loan that in the aggregate covered its $1 million principal, collateralized with the same Danek stock, which at the time had a value exceeding $2,500,000.  In their respective guaranty agreements, each member of the Rapp Group also waived any rights of indemnification, subrogation, reimbursement, or contribution from petitioner with respect to the Miller/Huntington Loan (the guarantor waivers).[7]

---

[7] Specifically, the guaranty agreement executed by each Rapp Group member provided as follows:

> In order to induce the Bank [Huntington] to lend money or advance credit to, renew, extend or forbear from demanding immediate payment of the Obligations of Debtor [petitioner], in reliance, in part, upon this Guaranty, GUARANTOR HEREBY WAIVES * * * ANY RIGHT OF INDEMNITY, REIMBURSEMENT OR CONTRIBUTION FROM THE DEBTOR * * * and the Guarantor further waives any right of subrogation to the rights of the Bank against the Debtor * * * which would otherwise arise by virtue of any payment made by the Guarantor to the Bank on account of this Guaranty, * * * and the Guarantor undertakes on behalf of himself, his legal representatives and assigns that neither the Guarantor nor the Guarantor's legal representatives or assigns will attempt to exercise of [sic] accept the benefits of any such right and should the Guarantor * * * receive any payment * * * on account of such right notwithstanding the provisions of this paragraph, such money * * * shall be held in trust by the recipient for

(continued...)

Petitioner agreed to certain covenants with respect to the Miller/Huntington Loan, including covenants that, other than the extension of credit by petitioner to MMS under the MMS/Miller Loan line of credit, petitioner would not, and would cause MMS not to, lend or incur indebtedness (except indebtedness for the purchase of property equal to the purchase price). Petitioner was also required under the Miller/Huntington Loan to submit MMS's financial statements and a report of MMS's accounts receivable to Huntington on a monthly basis, and to submit his personal financial statements as Huntington might from time to time require. No covenants had been required of petitioner as guarantor of the MMS/Huntington Loan. The Miller/Huntington Loan further provided that an event of default would exist if either petitioner or MMS became insolvent, or if MMS failed to comply with any provision of the MMS/Miller Loan.

On its Federal income tax return and financial statement for the 1992 calendar year, MMS reported a $750,000 loan from a shareholder as of yearend.

Modifications to the Restructured Loan

On February 15, 1993, the lines of credit under the Miller/Huntington Loan and MMS/Miller Loan were both increased by $250,000. These changes were effected through loan modification

---

[7](...continued)
the Bank * * * .

agreements executed by petitioner and Huntington, and MMS and petitioner, respectively.  Petitioner executed a $250,000 promissory note in favor of Huntington, and MMS executed a $250,000 promissory note in favor of petitioner, to cover the increased amounts under the respective credit lines.  Likewise, each member of the Rapp Group executed limited guaranties that in the aggregate covered the increase in the Miller/Huntington line of credit to $1,250,000.  Other than the $250,000 increase, the terms and conditions of the foregoing loan agreements and guaranties did not change in any material respect. Huntington's internal report covering the $250,000 increase listed the primary source of repayment as "Personal cash flow [of petitioner] and/or funds from Miller Medical Systems, Inc."

The Miller/Huntington Loan line of credit was drawn down to its full $1,250,000 authorized amount by November 1, 1993. Required monthly payments of interest were made to Huntington, along with periodic principal payments and draws, so that the outstanding balance on the Miller/Huntington Loan was $1,184,930 as of yearend 1993.  On its Federal income tax return for 1993, MMS reported $1,184,930 in loans from shareholders as of yearend, essentially the same figure recorded by Huntington as the

outstanding balance on the Miller/Huntington Loan as of that date.[8]

On January 19, 1994, the line of credit under the Miller/Huntington Loan was increased an additional $250,000 to $1,500,000. Petitioner executed a new promissory note in favor of Huntington for $1,500,000, which covered this increase and served as a substitute for the previously executed $1 million and $250,000 promissory notes. The line of credit under the MMS/Miller Loan was similarly increased, and MMS also executed a new promissory note in favor of petitioner for $1,500,000 which replaced the two prior outstanding promissory notes between the two. Parallel modifications were made to the limited guaranties of the Rapp Group, so that the guaranties in the aggregate covered the entire $1,500,000 amount authorized under the Miller/Huntington Loan. Huntington's internal report on the increase of the Miller/Huntington Loan to $1,500,000 listed the primary source of repayment as "Personal cash flow [of petitioner] and/or funds from Miller Medical Systems, Inc."

Additional security was provided in connection with the increase in the Miller/Huntington Loan to $1,500,000. First, petitioner's parents granted Huntington a $50,000 second mortgage

---

[8] Huntington's records list the 1993 yearend balance as $1,185,000, whereas the parties have stipulated that the figure was $1,184,930. The $70 discrepancy is not material, in our view.

on their personal residence as additional security for the Miller/Huntington Loan. Second, the loan agreement for the Miller/Huntington Loan was amended to require that the market value of the collateral securing the loan be maintained in amounts at least one-third greater than the authorized credit line; if not, Huntington could require Miller or the Rapp Group to provide additional security.

The newly increased Miller/Huntington Loan line of credit was drawn down to its full $1,500,000 authorized amount by April 8, 1994. Required monthly payments of interest were made to Huntington, along with periodic principal payments and draws, so that the outstanding balance on the Miller/Huntington Loan was $1,375,000 as of December 28, 1994. On its Federal income tax return for 1994, MMS reported $1,374,930 in loans from shareholders as of yearend.[9]

On June 30, 1994, the security provided for the Miller/Huntington Loan was again modified. The loan agreement was amended to require the Rapp Group to pledge collateral in the form of public securities (rather than Danek stock) with aggregate base and call values of $2,009,450.94 and of $1,785,385.42, respectively.

---

[9] The $70 discrepancy between the stipulated 1994 yearend balance of the Miller/Huntington Loan and the figure reported by MMS as the outstanding amount of loans from shareholders is not material, in our view. Cf. supra note 8.

MMS's Default

In December 1994, MMS became insolvent. At that time, there was an outstanding balance of $1,375,000 on the Miller/Huntington Loan. On December 29, 1994, the Rapp Group, as guarantors, paid $900,000 to Huntington in partial satisfaction of the Miller/Huntington Loan. The Rapp Group then satisfied the remaining $475,000 on the Miller/Huntington Loan by taking out personal loans from Huntington and using the proceeds to purchase the Miller/Huntington Loan note.[10] Concurrently, petitioner and the Rapp Group formed a new entity operating under the name MSR Technologies, LLC (MSR), which purchased MMS's remaining assets and completed MMS's outstanding contracts. Upon MSR's completion of the contracts, MSR paid the proceeds to the Rapp Group, which in turn used the proceeds to repay their personal loans from Huntington.

As of the trial in this case, petitioner had not made any payments to the Rapp Group to reimburse them for their payments to satisfy the Miller/Huntington Loan pursuant to their guaranties, nor had the Rapp Group sought reimbursement from petitioner.

Petitioner submitted a personal financial statement as of December 29, 1994, to Huntington in connection with MMS's default, which listed assets of $583,000 (consisting of petitioner's

---

[10] It was anticipated that the completion of MMS's outstanding contracts, coupled with the liquidation of its assets, would result in proceeds of approximately $475,000.

residence, bank account, automobile, and personal property), and liabilities of $310,000 (consisting of a mortgage on petitioner's residence, an automobile loan, and other accounts payable). Petitioner listed the Miller/Huntington Loan as a contingent liability, thereby excluding it as a liability for purposes of calculating his net worth.[11]  Excluding the Miller/Huntington Loan, petitioner's net worth as of December 29, 1994, was listed as $273,000 ($583,000 in assets minus $310,000 in liabilities). Petitioner did not list his MMS stock as an asset on the financial statement because MMS had ceased operations and was insolvent.[12]

Petitioners' Return Positions

Reflecting the outstanding balances on the Miller/Huntington Loan and the MMS/Miller Loan at the end of 1992, 1993, and 1994 of $750,000, $1,184,930, and $1,375,000, respectively, petitioners claimed basis in indebtedness from MMS of $750,000 as of December 31, 1992, as well as annual increases of $434,930 as of December 31, 1993, and $190,000 as of December 31, 1994.  Petitioners consequently deducted ordinary corporate losses from MMS in the amount of $750,000 for 1992, $431,691 for 1993, and $189,845 for

_____

[11] Although petitioner listed the outstanding balance for the Miller/Huntington Loan as $1,500,000 on the financial statement, it is undisputed that the balance was $1,375,000.

[12] A Jan. 17, 1995, report by MMS to its creditors disclosed that, as of yearend 1994, MMS's secured debt substantially exceeded its assets, and that the company had an additional $1,800,000 of unsecured debt.

1994. These deductions produced net operating loss carryback deductions of $485,303 for 1989, $87,174 for 1990, and $83,018 for 1991, as well as net operating loss carryover deductions of $238,293 for 1994 and $206,178 for 1995.

Petitioners in addition claimed a net short-term capital loss of $5,849 and a long-term capital loss carryover of $8,194 for 1994, both of which were subsequently carried over into 1995.

Petitioners did not report any interest income incident to the MMS/Miller Loan on their 1993 return. On their 1994 return, petitioners reported $109,674 of taxable interest income attributable to MMS.[13]

Respondent's Determinations

In a notice of deficiency, respondent determined that petitioners were not entitled to any basis in the Huntington indebtedness in 1992, 1993, or 1994 and disallowed petitioners' claimed losses of $750,000, $431,691, and $189,845, in 1992, 1993, and 1994, respectively, as well as the resulting net operating loss carryback deductions of $485,303 for 1989, $87,174 for 1990, and $83,018 for 1991, and carryover deductions of $238,293 for 1994 and $206,178 for 1995. Respondent also determined that

---

[13] The amount of interest that MMS may have deducted on its Forms 1120S, U.S. Income Tax Return for an S Corporation, for 1993 and 1994 with respect to the Huntington loans is not disclosed in the record. Huntington's records indicate that the bank received $58,067.97 and $108,522.81 in interest payments with respect to the Miller/Huntington Loan in 1993 and 1994, respectively.

petitioners were not "at risk" as of the close of 1992, 1993, and 1994, with respect to the amounts borrowed from Huntington, and disallowed the deductions on that basis.  Furthermore, respondent determined in the alternative that if any of the foregoing deductions from MMS were allowed, then the payment by guarantors of $1,350,000 in 1994 was "taxable forgiveness of debt income" to petitioners.[14]

OPINION

Issue 1.  Section 1366(d)(1)(B) Basis Limitation

Section 1366(a) provides that a shareholder of an S corporation shall take into account his pro rata share of the S corporation's items of income, loss, deduction, or credit. However, a shareholder may deduct his share of the S corporation's losses only to the extent of his adjusted basis in his stock of the S corporation, sec. 1366(d)(1)(A), and "the shareholder's adjusted basis of any indebtedness of the S corporation to the shareholder", sec. 1366(d)(1)(B) (emphasis added).  Any S corporation losses so limited may be carried forward indefinitely. Sec. 1366(d)(2).

The jurisprudence in this area has fleshed out certain principles relating to the limitation set forth in section 1366(d)(1)(B) and the situations under which a shareholder

---

[14] Respondent now contends that only $900,000 of the Dec. 29, 1994, payment by the guarantors constitutes cancellation of indebtedness income to petitioners.

acquires basis with respect to indebtedness.  See <u>Hitchins v.</u>
<u>Commissioner</u>, 103 T.C. 711, 715 (1994); <u>Grojean v. Commissioner</u>,
T.C. Memo. 1999-425, affd. 248 F.3d 572 (7th Cir. 2001).  First, a
shareholder must make an actual economic outlay.  <u>Underwood v.</u>
<u>Commissioner</u>, 535 F.2d 309 (5th Cir. 1976), affg. 63 T.C. 468
(1975); <u>Perry v. Commissioner</u>, 54 T.C. 1293, 1296 (1970), affd. 27
AFTR 2d 71-1464, 71-2 USTC par. 9502 (8th Cir. 1971).[15]  The
economic outlay must leave the taxpayer "poorer in a material
sense" in order for its bona fides to be respected.  <u>Perry v.</u>
<u>Commissioner</u>, <u>supra</u> at 1296; see also <u>Bergman v. United States</u>,
174 F.3d 928, 933 (8th Cir. 1999).[16]

Next, the S corporation's indebtedness must run directly to
the shareholder; an indebtedness to a passthrough entity that

---

[15] The economic outlay requirement stems from the concept
that an S corporation shareholder should be entitled to basis to
the extent of his investment in the S corporation.  S. Rept.
1983, 85th Cong., 2d Sess. 219-220 (1958), 1958-3 C.B. 922, 1141
("The amount of the net operating loss apportioned to any
shareholder * * * is limited under [former] section 1374(c)(2)
[the predecessor of sec. 1366(d)] to the adjusted basis of the
shareholder's <u>investment</u> in the corporation; that is, to the
adjusted basis of the stock in the corporation owned by the
shareholder and the adjusted basis of any indebtedness of the
corporation to the shareholder." (emphasis added)); see also
<u>Perry v. Commissioner</u>, 54 T.C. 1293, 1296 (1970) (concluding that
the word "investment" indicated an intent to limit a
shareholder's basis to that shareholder's "actual economic
outlay").

[16] As we noted in <u>Perry</u>, the "poorer in a material sense"
standard for testing an economic outlay merely restates the well-
settled predicate for allowing any deduction.  <u>Perry v.</u>
<u>Commissioner</u>, <u>supra</u> at 1296.

advanced the funds and is closely related to the taxpayer does not satisfy the statutory requirements. Frankel v. Commissioner, 61 T.C. 343 (1973), affd. without published opinion 506 F.2d 1051 (3d Cir. 1974); Burnstein v. Commissioner, T.C. Memo. 1984-74. Furthermore,

> No form of indirect borrowing, be it a guaranty, surety, accommodation, comaking or otherwise, gives rise to indebtedness from the corporation to the shareholders until and unless the shareholders pay part or all of the existing obligation. Prior to that crucial act, "liability" may exist, but not debt to the shareholders. [Raynor v. Commissioner, 50 T.C. 762, 770-771 (1968).]

Basis-generating "direct" indebtedness of the S corporation to the shareholder for purposes of section 1366(d)(1)(B) generally arises when a shareholder makes a loan to his S corporation. That a shareholder may fund his loan to the S corporation with money borrowed from a third-party lender does not alter the tax consequences. Bolding v. Commissioner, 117 F.3d 270 (5th Cir. 1997), revg. T.C. Memo. 1995-326; Underwood v. Commissioner, supra at 312 n.2; Hitchins v. Commissioner, supra at 718 & n.8; Raynor v. Commissioner, supra at 771. However, where the source of the funding for such "back-to-back" loans is a related party instead of an independent third-party lender, this and other courts have often found that a shareholder made no economic outlay sufficient to create basis since the necessity of the shareholder's repayment of the funds is uncertain, see, e.g., Oren v. Commissioner, 357 F.3d 854 (8th Cir. 2004), affg. T.C. Memo. 2002-172; Underwood v.

Commissioner, supra, although not invariably, see Yates v. Commissioner, T.C. Memo. 2001-280; Culnen v. Commissioner, T.C. Memo. 2000-139, revd. on another ground 28 Fed. Appx. 116 (3d Cir. 2002). Thus, the presence of a third-party lender as a source of the funds lent by the shareholder to his S corporation has been an important factor in determining whether the shareholder made an actual economic outlay. The certainty that an unrelated, arm's-length lender will enforce repayment from the shareholder supports the conclusion that the shareholder has made an economic outlay in connection with lending funds to his S corporation. See Oren v. Commissioner, supra; Bergman v. United States, supra.

The same result as a "back to back" loan is reached where a shareholder substitutes his own note for the note of his S corporation on which he was a guarantor, thereby becoming the sole obligor on the new indebtedness. Gilday v. Commissioner, T.C. Memo. 1982-242; see also Rev. Rul. 75-144, 1975-1 C.B. 277.[17] In such "note substitution" scenarios, so long as the S corporation's

_____

[17] Rev. Rul. 75-144, 1975-1 C.B. 277, held that basis is generated on the shareholder's substitution of his note for the S corporation's note if the corporation becomes indebted to the shareholder under State law subrogation rules. In Gilday v. Commissioner, T.C. Memo. 1982-242, however, we dispensed with the subrogation requirement and held that where a shareholder substituted his own note for the S corporation's and the corporation's debt was extinguished, the corporation became indebted to the shareholder, regardless of the effect of State law subrogation rules, and thus the shareholder was entitled to basis in the substituted note under the predecessor of sec. 1366(d)(1)(B).

indebtedness to the third-party lender is extinguished, so that the shareholder becomes the sole obligor to the lender, the shareholder's assumption of what was formerly the S corporation's legal burden serves as a constructive furnishing of funds to the S corporation for which the S corporation becomes indebted to repay to the shareholder.  See Hitchins v. Commissioner, 103 T.C. at 718; Gilday v. Commissioner, supra; Rev. Rul. 75-144, supra.

Viewing the restructuring of the line of credit as a whole, we believe that under the principles of Gilday v. Commissioner, supra, and Raynor v. Commissioner, supra, petitioners are entitled to the basis they have claimed.  The December 30, 1992, transaction conformed in all material respects to the note substitution in Gilday.  Petitioner gave his fully recourse $1 million promissory note to Huntington to replace MMS's promissory note of like amount on which he had formerly served as guarantor. Huntington thereupon advanced $750,000 under petitioner's note and recorded MMS's note as satisfied by virtue of the payment of its $750,000 outstanding balance.  MMS in turn gave a promissory note to petitioner which mirrored the terms of petitioner's note to Huntington.[18]  Participating in the foregoing transactions was an independent, third-party lender, a factor "critical to the result in Gilday".  Bergman v. United States, supra at 933; see also Oren

---

[18] In Gilday, the S corporation did not execute promissory notes in favor of the shareholders until sometime after the year in issue.

v. Commissioner, T.C. Memo. 2002-172.  As in Gilday, a principal motivation for the note substitution was to generate basis for purposes of section 1366(d)(1)(B).[19]

Similarly, the two subsequent $250,000 increases in the respective credit lines extended by Huntington to petitioner and by petitioner to MMS on February 15, 1993, and January 19, 1994, followed the format of back-to-back loans that were held to create basis in Raynor v. Commissioner, supra.  See also Bolding v. Commissioner, supra; Yates v. Commissioner, supra; Culnen v. Commissioner, supra.  That is, petitioner borrowed the additional amounts from Huntington and immediately re-lent them to MMS, with the indebtedness between petitioner and Huntington, and between MMS and petitioner, fully documented.

Therefore, petitioner made an economic outlay, which left him poorer in a material sense, by virtue of becoming the fully recourse obligor on enforceable debt held by an independent,

---

[19] Petitioners argue in addition that the restructuring of the line of credit also enabled Huntington to remove the indebtedness from its internal "watch list".  However, we find that the bank officer's testimony on this point is too uncertain, and the claim itself too improbable, to persuade us that the substitution of petitioner (who lacked substantial net worth) for MMS as the primary obligor to Huntington caused the loan to be removed from the watch list.  A much more plausible explanation for the removal from the watch list, in our view, was the addition of the fully collateralized guaranties of the Rapp Group, which covered the full amount of the outstanding indebtedness.

third-party lender.[20]  Petitioner then re-lent the proceeds of this indebtedness to MMS, creating direct indebtedness of his S corporation to him, within the meaning of section 1366(d)(1)(B), in sufficient amounts to cover the losses claimed in 1992, 1993, and 1994.

Respondent contends, however, that no substantive indebtedness was created between petitioner and Huntington as a result of the restructuring because MMS remained in substance the borrower from Huntington.  In respondent's view, petitioner was at best some kind of accommodation surety with respect to the indebtedness, a role insufficient to give him basis under section 1366(d)(1)(B).  In support of this position, respondent makes various arguments, including a claim that Huntington still held a promissory note from MMS after the restructuring; that petitioner was required by Huntington to assign to Huntington the promissory note given to him by MMS in connection with the MMS/Miller Loan, as well as all other MMS assets that had previously secured the MMS/Huntington Loan; that the proceeds of the Miller/Huntington indebtedness were required to be used by MMS and MMS was the source of repayment; and that petitioner did not consistently report interest income from the MMS/Miller Loan.  Thus, in respondent's view, petitioner's status as borrower from Huntington

_____

[20] In addition, the restrictive covenants imposed on petitioner in connection with the Miller/Huntington Loan significantly constrained his ability to lend and borrow money.

and lender to MMS should be disregarded, and the transaction treated as in substance still a loan from Huntington to MMS, with the result that petitioners obtained no basis for purposes of section 1366(d)(1)(B).

We find respondent's arguments unpersuasive. Respondent's assertion at various points that Huntington still held MMS's promissory note[21] is not supported by the record. Concededly, petitioners did not produce a canceled version of the MMS/Huntington promissory note, but Huntington's business records document the note as satisfied on December 30, 1992, by payment of its $750,000 balance.

Respondent further contends that MMS, not petitioner, was in substance the borrower from Huntington because petitioner was required by Huntington to assign to Huntington the MMS/Miller promissory note. Because of the assignment, Huntington "essentially owned and controlled" the note MMS executed in favor of petitioner and was its "beneficial owner", respondent argues. By contrast, petitioners maintain that petitioner made only a collateral assignment of the note. We agree with petitioners.

---

[21] Respondent's apparent goal is to draw a parallel with Hitchins v. Commissioner, 103 T.C. 711, 717-718 (1994), wherein the lack of a cancellation or novation of the original debt between the taxpayer and his C corporation, which debt was assumed by the taxpayer's S corporation, figured prominently in our conclusion that the S corporation's assumption of that debt did not create direct indebtedness between it and the taxpayer for purposes of the predecessor of sec. 1366(d)(1)(B).

Under Indiana law,

> [a]n assignment is a transfer which confers a complete and present right in a subject matter to the assignee. * * * In determining whether an assignment has been made, the question is one of intent. * * * A written agreement assigning a subject matter must manifest the assignor's intent to transfer the subject matter clearly and unconditionally to the assignee. * * * [Brown v. Ind. Natl. Bank, 476 N.E.2d 888, 894 (Ind. Ct. App. 1985); citations omitted.]

By contrast, "an agreement which conditionally transfers ownership rights to a creditor and permits the creditor to exercise its right only upon a default is a security agreement--not an outright assignment." Smoker v. Hill & Associates, 204 Bankr. 966, 973 (N.D. Ind. 1997) (emphasis added) (citing Brown v. Ind. Natl. Bank, supra at 892).

The terms of Huntington's interest in the MMS/Miller promissory note are delineated in the security agreement executed by petitioner under the Miller/Huntington Loan, which states:

> Timothy J. Miller ("Debtor") * * * hereby grants, pledges and assigns to The Huntington National Bank of Indiana ("Bank"), a security interest in the following property * * * :
>
> *     *     *     *     *     *     *
>
> (b) All of Debtor's rights in, to, and under a certain Commercial Loan Note executed by Miller Medical Systems, Inc. on or about December 30, 1992 [i.e., the MMS/Miller promissory note];
>
> *     *     *     *     *     *     *

The security interest hereby granted is to secure the prompt and full payment and complete performance of all Obligations of Debtor to Bank.  [Emphasis added.]

Given the foregoing terms of the security agreement, respondent's contention that petitioner made an outright assignment to Huntington of the MMS/Miller promissory note must fail.  The security agreement clearly sets forth a <u>collateral</u> assignment of a security interest in the note.  Moreover, a Uniform Commercial Code financing statement was filed on December 31, 1992, to perfect Huntington's <u>security interest</u> in the "Commercial Loan Note executed by Miller Medical Systems, Inc. on or about December 30, 1992".  Thus, respondent's repeated contention that "at any given point in time, Huntington held promissory notes for the identical amount due it from both Mr. Miller and MMS" is simply wrong; it is inconsistent with the rights and obligations effected in the restructuring.  After the restructuring, MMS would become directly liable to Huntington only in the event of a default by petitioner or MMS.  Absent default, MMS was directly liable to petitioner, not Huntington.  Consequently, petitioner's collateral assignment of the MMS/Miller promissory note to Huntington provides no grounds for disregarding the separate indebtedness running between MMS and petitioner, and between petitioner and Huntington.[22]

---

[22] In a similar vein, we find no material significance in the fact that petitioner was required to make a collateral

(continued...)

Respondent in addition points out that MMS was the recipient of the loan proceeds and the expected source of repayment, citing authorities where these factors contributed to a finding that no basis was generated by the indebtedness. While these factors have been cited by courts, it has generally been in situations where the taxpayer and his S corporation were co-obligors on the indebtedness, or the taxpayer was claiming basis notwithstanding his status as a mere guarantor or surety. See, e.g., Estate of Leavitt v. Commissioner, 90 T.C. 206 (1988), affd. 875 F.2d 420 (4th Cir. 1989); Borg v. Commissioner, 50 T.C. 257 (1968); Salem v. Commissioner, T.C. Memo. 1998-63, affd. 196 F.3d 1260 (11th Cir. 1999); Reser v. Commissioner, T.C. Memo. 1995-572, affd. in part and revd. in part on another ground 112 F.3d 1258 (5th Cir. 1997). In any event, the use of the loan proceeds by the corporation is far from dispositive; the loan proceeds were intended for and used by the corporations in the back-to-back loan and note substitution arrangements in Raynor v. Commissioner, 50 T.C. 762 (1968), and Gilday v. Commissioner, T.C. Memo. 1982-242, cases where the indebtedness was held to generate basis. As for

---

[22](...continued)
assignment to Huntington of all the other MMS assets pledged to him as security for the MMS/Miller Loan (which assets had previously secured the MMS/Huntington Loan). The taxpayer in Bolding v. Commissioner, 117 F.3d 270 (5th Cir. 1997), revg. T.C. Memo. 1995-326, was treated as the true borrower notwithstanding that the assets acquired by his S corporation with the loan proceeds were pledged as security for the taxpayer's loan.

the expected source of repayment, Huntington's contemporaneous records indicate that it was looking both to petitioner and to MMS for repayment. Huntington's internal reports prepared in connection with the bank's decisions to increase the authorized principal of the Miller/Huntington Loan in February 1993 and January 1994 both listed the primary source of repayment as "Personal cash flow [of petitioner] and/or funds from Miller Medical Systems, Inc." Moreover, when the authorized principal amount of the Miller/Huntington Loan was increased for the second time in January 1994, Huntington sought and obtained a second mortgage on the residence of petitioner's parents, suggesting that Huntington continued to rely on petitioner personally as a source of repayment. In short, the use of proceeds and source of repayment factors do not persuade us that the loan from Huntington to petitioner should be disregarded, and MMS treated as borrowing directly from Huntington rather than petitioner.

We also attach little consequence to petitioners' inconsistent tax reporting of the interest arising from the Miller/Huntington and MMS/Miller Loans. Petitioners failed to report any interest income from the MMS/Miller Loan in 1993, but they reported $109,674 of such interest in 1994. Since the MMS/Miller Loan and Miller/Huntington Loan had mirror terms for interest, any interest income petitioner received on the MMS/Miller Loan would have been offset by petitioner's interest

expense on the Miller/Huntington Loan, presumably resulting in a wash.[23]  On its 1992, 1993, and 1994 returns, MMS consistently reported the outstanding yearend balance of the restructured financing as loans from shareholders.

Respondent also relies on Grojean v. Commissioner, T.C. Memo. 1999-425, affd. 248 F.3d 572 (7th Cir. 2001), to support his position that petitioner, after the loan restructuring, was in substance merely an accommodation surety or guarantor of a loan made by Huntington to MMS.  In Grojean v. Commissioner, supra, the taxpayer acquired a participation interest in a third-party bank's loan to his S corporation, using funds lent to him by the bank for this purpose.  We rejected the taxpayer's claim that his participation interest in the loan resulted in indebtedness of his S corporation to him for purposes of section 1366(d)(1)(B).  We held instead that, under the principle of Gregory v. Helvering, 293 U.S. 465, 469-470 (1935), that a transaction's substance controls over its form, the arrangement was in substance a mere guaranty by the taxpayer of the indebtedness, which did not give rise to basis.

_____

[23] As part of his adjustments in the notice of deficiency, respondent eliminated the $109,674 of interest reported as income by petitioners for 1994 but appears to suggest on brief that petitioners must recognize this income.  We disagree, because it would appear that petitioners' interest income from the MMS/Miller Loan is offset by their interest expense on the Miller/Huntington Loan.  We expect the parties to resolve any discrepancies in accounting for interest expense in their Rule 155 computations.

In finding that the arrangement in Grojean v. Commissioner, supra, was in substance a mere guaranty by the taxpayer, we emphasized several factors. First, there was no debtor-creditor relationship between the S corporation and the taxpayer. The taxpayer was not a party to the note between the bank and the S corporation; he had no direct rights against the S corporation, and the S corporation had no direct obligation to him. Instead, the taxpayer's only contractual relationship was with the bank, and the bank had sole discretion to enforce all rights against the S corporation under the indebtedness. Second, the participation agreement creating the taxpayer's participation interest provided that the bank's interest in the S corporation's note was superior to the participation interest. The taxpayer received interest and principal only after the bank received its share of these items. Third, the S corporation's certified financial statements reflected the taxpayer's lack of creditor status, as they reported his participation interest as a guaranty of the corporation's indebtedness. Finally, because the bank had lent the taxpayer the funds with which to acquire the participation interest, and the S corporation's repayment obligation mirrored the taxpayer's repayment obligation for the acquisition funds, the taxpayer "would not be out-of-pocket unless and until * * * [the S corporation] failed to make payments under the * * * note" to the bank. Thus, we concluded, the taxpayer was in substance a

guarantor of the indebtedness between the S corporation and the bank.

In applying the "substance over form" doctrine in Grojean v. Commissioner, supra, we did not purport to overrule Raynor v. Commissioner, supra, or Gilday v. Commissioner, supra. Instead, we emphasized the distinctions between the lending arrangement in Grojean and those found to give rise to basis in Raynor and Gilday. We reasoned that, in Raynor, the taxpayer had borrowed from a third party and then directly lent the funds to his S corporation, whereas the taxpayer in Grojean "did not relend the funds directly to" his S corporation. Grojean v. Commissioner, supra. In Gilday, we observed, the taxpayer (along with other shareholders of an S corporation) issued his note to a third-party bank which thereupon canceled the S corporation's note it held. In exchange, the S corporation gave its note of the same amount to the taxpayer (and other shareholders). The result, we noted, was direct indebtedness of the S corporation to the shareholders in Gilday, whereas the S corporation in Grojean "was not directly indebted to petitioner in any way, and petitioner's rights were against * * * [the bank], not * * * [the S corporation]." Grojean v. Commissioner, supra.

When the loan arrangements at issue are compared to those in Grojean v. Commissioner, supra, on the one hand and to those in Raynor v. Commissioner, supra, and Gilday v. Commissioner, supra,

on the other, the present arrangements fall outside our holding in Grojean. Upon completion of the loan restructuring, MMS's original indebtedness to Huntington (the MMS/Huntington Loan) was recorded by the bank as satisfied, and petitioner held MMS's note (and related security agreement) under which MMS was directly indebted to petitioner and petitioner had direct, unsubordinated rights as creditor against MMS. Under the principles of Gilday, petitioner's substitution of his note for MMS's note with Huntington constituted a constructive furnishing of funds to MMS by petitioner, giving rise to direct indebtedness. On MMS's financial statement and tax return for 1992, and its tax returns for 1993 and 1994,[24] the restructured indebtedness was reported as a loan from a shareholder, not a shareholder guaranty. Pursuant to the later modifications to the loan agreements, under which additional amounts were advanced to MMS, petitioner obtained funds from Huntington in exchange for his note, which were then provided to MMS in exchange for MMS's note to petitioner, in conformance with the back-to-back loan transactions that gave rise to basis in Raynor.

The Court of Appeals for the Seventh Circuit, to which an appeal in this case lies, affirmed our decision in Grojean, applying substance-over-form principles. Grojean v. Commissioner,

_____

[24] MMS's financial statements for 1993 and 1994 are not in the record.

248 F.3d 572 (7th Cir. 2001). Nothing in the Court of Appeals opinion dictates a decision in respondent's favor. See Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). In affirming our holding that the taxpayer was a guarantor rather than a lender of funds for his S corporation, the Court of Appeals offered an analysis of the difference between a lender and a guarantor: while both assume a risk of default, a lender procures or supplies funds for a borrower whereas a guarantor (by assuming the risk of default) enables funds to be supplied to the borrower. Grojean v. Commissioner, 248 F.3d at 573. In concluding that the taxpayer was a guarantor rather than lender, the Court of Appeals observed:

> Grojean [the taxpayer] did not procure $1.2 million for the use of Schanno [the S corporation], as he would have done had he gone to a bank or other lender, borrowed $1.2 million from it, and written a check for that amount to Schanno. [Id.]

The Court of Appeals also affirmed our conclusion (which it construed as an alternate holding) that there was no basis-generating direct indebtedness between the taxpayer and his S corporation because no debtor-creditor or other contractual relationship existed between them. Id. at 576.

Here, petitioner borrowed from Huntington--on a fully recourse basis,[25] accepting restrictive covenants to obtain the

---

[25] In one of the subsequent modifications increasing the outstanding principal on the Miller/Huntington Loan, Huntington

(continued...)

funds--and re-lent the funds to MMS in exchange for MMS's note and related security agreement, creating a direct debtor-creditor relationship between petitioner and MMS. Thus, petitioner "procured" funds for MMS, making him a lender rather than a guarantor under the Court of Appeals analysis, and petitioner had direct rights against MMS as a creditor, distinguishing this arrangement from the participation interest at issue in Grojean.

In sum, we conclude that the restructuring transaction, wherein petitioner borrowed from Huntington on a recourse basis and re-lent to MMS, with both loans fully documented so as to create enforceable legal obligations, contains "adequate substance" so that it is "not to be disregarded." Hitchins v. Commissioner, 103 T.C. at 719. After the restructuring, MMS was directly indebted to petitioner, and petitioner had enforceable creditor's rights against MMS. Consequently, there was indebtedness "of" MMS "to" petitioner within the meaning of section 1366(d)(1)(B), so that the outstanding indebtedness under the MMS/Miller Loan at the close of 1992, 1993, and 1994 generated basis in those amounts.

Issue 2. "At Risk" Limitation

Respondent argues, in the alternative, that in the event it is concluded that petitioners had sufficient basis to deduct the

_____

[25](...continued)
also obtained a second mortgage on petitioner's parents' residence as security for the indebtedness.

claimed losses for the years in issue, the deductions are not allowable because petitioners were not "at risk" within the meaning of section 465 with respect to the Huntington indebtedness.

Section 465(a) limits the losses a taxpayer may deduct with respect to a particular activity to the "aggregate amount with respect to which the taxpayer is at risk * * * for such activity". Sec. 465(a); <u>Alexander v. Commissioner</u>, 95 T.C. 467, 469 (1990), affd. without published opinion sub nom. <u>Stell v. Commissioner</u>, 999 F.2d 544 (9th Cir. 1993). Section 465(c)(3)(A)(i) provides that the "at risk" rules apply to each activity engaged in by the taxpayer in carrying on a trade or business or for the production of income.

A taxpayer's "at risk" amount includes the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity, section 465(b)(1)(A), as well as certain amounts borrowed with respect to the activity.[26] Sec. 465(b)(1)(B). For borrowed amounts relating to a particular activity, a taxpayer is considered to be "at risk" where the taxpayer is personally liable for repayment of such amounts or has pledged assets unrelated to the business for which the money was borrowed. Sec. 465(b)(2)(A) and (B); <u>Krause v. Commissioner</u>, 92

---

[26] The determination of the amount that a taxpayer has "at risk" as to a given activity is made at the close of the taxable year. Sec. 465(a)(1).

T.C. 1003, 1016-1017 (1989), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994). However, a taxpayer will not be considered "at risk" with respect to borrowed amounts if the amounts are protected against loss "through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." Sec. 465(b)(4); see also Oren v. Commissioner, 357 F.3d at 859.

In analyzing whether a particular transaction runs afoul of section 465(b)(4), the standard we have generally employed is whether the taxpayer faces any "realistic possibility of economic loss" on the transaction. Levien v. Commissioner, 103 T.C. 120, 126 (1994), affd. without published opinion 77 F.3d 497 (11th Cir. 1996).[27] Stated differently, where a transaction is structured so as to remove any realistic possibility of the taxpayer suffering an economic loss, the taxpayer is not "at risk" for the borrowed amounts. Id.; see also Oren v. Commissioner, supra.

Respondent argues that petitioners were not "at risk" with respect to the Huntington indebtedness because the guarantor waivers executed by the Rapp Group resulted in petitioners' being

---

[27] By comparison, the Court of Appeals for the Sixth Circuit employs a "worst-case scenario" standard in analyzing whether a transaction runs afoul of sec. 465(b)(4). See, e.g., Pledger v. United States, 236 F.3d 315, 319 (6th Cir. 2000). Although the Court of Appeals for the Seventh Circuit, to which this case is appealable, has not expressly adopted either standard, we note that it has cited the "realistic possibility of loss" standard with approval. See HGA Cinema Trust v. Commissioner, 950 F.2d 1357, 1362-1363 (7th Cir. 1991), affg. T.C. Memo. 1989-370.

"protected against loss" within the meaning of section 465(b)(4).
In respondent's view, because the Rapp Group waived any right of
recovery from petitioner in the event that they were required to
perform under their guaranties,[28] petitioners faced no realistic
possibility of loss with respect to the amounts borrowed from
Huntington and, therefore, may not deduct losses attributable
thereto. As part of his argument, respondent maintains that
petitioner was a third-party beneficiary of the contract embodied
in the guarantor waivers, and could therefore have defeated any
action by the Rapp Group to recover from him the amounts they paid
to Huntington under their guaranties.

Even assuming arguendo that the Rapp Group was effectively
precluded from obtaining any reimbursement from petitioner of
their guaranty payments, we do not agree that this factor
eliminated any realistic possibility of loss by petitioner with
respect to the Miller/Huntington Loan. Under the
Miller/Huntington Loan, petitioner was the primary obligor on a
recourse basis. He gave a second mortgage on his residence to
secure his obligation. It is true that when MMS declared
insolvency (which was an event of default under the
Miller/Huntington Loan), Huntington in fact sought and obtained

---

[28] Absent a waiver, a guarantor generally is entitled to
recover from the primary obligor any amounts that the guarantor
is required to pay to satisfy indebtedness. See, e.g., Brand v.
Commissioner, 81 T.C. 821, 828 (1983).

recovery from the Rapp Group guarantors, presumably because at that time petitioner's net worth, disregarding the Miller/Huntington Loan, was $273,000, consisting primarily of relatively illiquid assets such as the equity in his residence, an automobile, and items of personal property. However, had petitioner's financial circumstances been different, Huntington was entitled to seek full or partial recovery from him and quite possibly would have done so. In short, there was no certainty that the guarantors would be called upon to satisfy the indebtedness. As a consequence, we conclude that petitioner had a realistic possibility of loss thereon.

Respondent relies on Levien v. Commissioner, supra, and Oren v. Commissioner, supra, in support of his contention that petitioners were protected from loss within the meaning of section 465(b)(4). In those cases, we concluded that the offsetting obligations of all the parties to an arrangement would cease in the event of nonpayment by one party, resulting in no loss to the taxpayer. However, the transactions at issue in those cases bear no meaningful resemblance to the indebtedness under scrutiny in this case. Here, depending on the circumstances, petitioner could have been required to satisfy all or part of the Miller/Huntington Loan, even if MMS ceased making payments to him under the MMS/Miller Loan. We accordingly conclude that petitioners were at risk within the meaning of section 465 with respect to the amounts

borrowed from Huntington; that section does not preclude petitioners' entitlement to the losses claimed.

Consequently, we hold that petitioners' at-risk amounts with respect to their investment in MMS encompass the full amount of the outstanding balances on the Miller/Huntington Loan at the end of 1992, 1993, and 1994; namely, $750,000, $1,184,930, and $1,375,000, respectively.

Issue 3.  Discharge of Indebtedness

A.  Section 61(a) Inclusion

Respondent determined, in the alternative, that in the event deductions for the 1992, 1993, and 1994 losses were allowed, then petitioners must recognize $1,350,000 as discharge of indebtedness income in 1994 (i.e., the amount that the examining agent determined was the outstanding balance due on the Miller/Huntington Loan that was paid off or assumed by the Rapp Group on December 29, 1994).[29]  Respondent now concedes that the Rapp Group repaid only $900,000 of the Miller/Huntington Loan in

---

[29] Although the determination in the notice of deficiency was apparently predicated on the assumption that the outstanding principal of the Miller/Huntington Loan was approximately $1,350,000 when the Rapp Group assumed responsibility for it, the actual figure was $1,375,000.  The discrepancy need not concern us, however, as respondent has now conceded that only $900,000 of the indebtedness was satisfied by the Rapp Group in 1994.

1994, and consequently only $900,000 is includible in petitioners' 1994 income under respondent's alternative determination.[30]

Section 61(a) states that, unless otherwise provided: "gross income means all income from whatever source derived". Included within this broad definition is income from the discharge of indebtedness, which occurs when a taxpayer is released from his indebtedness or the indebtedness is satisfied for less than its face amount. Sec. 61(a)(12); United States v. Kirby Lumber Co., 284 U.S. 1 (1931); Cozzi v. Commissioner, 88 T.C. 435, 445 (1987). The theory underlying discharge of indebtedness income is that loan proceeds previously untaxed because offset by a repayment obligation are freed up when the obligation is eliminated without payment, resulting in an accession to income. United States v. Kirby Lumber Co., supra at 3. Whether a debt has been discharged is dependent on the substance of the transaction. Cozzi v. Commissioner, supra.

---

[30] On brief, respondent also asserts as an alternative argument that petitioners must recognize the income under the principles of Old Colony Trust Co. v. Commissioner, 279 U.S. 716 (1929), because petitioner's obligation to repay Huntington was discharged by a third party; namely, the Rapp Group. Respondent also cites sec. 1.61-14(a), Income Tax Regs., to support the alternative determination of income. However, the determination in the notice of deficiency, maintained in the answer, was that petitioners were required to recognize "forgiveness of debt" income. Respondent has not sought to amend the pleadings to assert any theory beyond forgiveness of indebtedness income, and we decline to allow him to do so for the first time on brief. See, e.g., Smalley v. Commissioner, 116 T.C. 450, 456 (2001).

Respondent contends that petitioners received $900,000 of discharge of indebtedness income on December 29, 1994, when the Rapp Group paid that amount as guarantors in partial satisfaction of the Miller/Huntington Loan. Petitioner was at this point released from his obligation to the extent of $900,000, respondent argues, because the Rapp Group had waived any right to reimbursement from petitioner under the guarantor waivers. Petitioners contend that no discharge occurred on December 29, 1994, because petitioner remained liable to the Rapp Group for the $900,000 they paid as guarantors.

We agree with respondent. The only evidence supporting the contention that petitioner remained liable to the Rapp Group for $900,000 is his self-serving testimony to that effect. We are not required to accept such testimony. See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). Balanced against petitioner's testimony are, first, the terms of the guarantor waivers, under which the Rapp Group waived any right of indemnification or reimbursement (or subrogation from Huntington) against petitioner that would otherwise arise by virtue of any payment under their guaranties. Second, in the more than 8 years between the Rapp Group's payment under their guaranties and the trial in this case, the Rapp Group did not seek reimbursement from petitioner, nor did petitioner make any payment in satisfaction of his purported liability to them.

A debt is deemed discharged as soon as it becomes clear, on the basis of a practical assessment of all the facts and circumstances, that it will never have to be repaid. Cozzi v. Commissioner, supra at 445. The existence of a faint possibility that a debt will be collected does not prevent the recognition of discharge of indebtedness income. Exch. Sec. Bank v. United States, 492 F.2d 1096, 1099 (5th Cir. 1974). Moreover, petitioners bear the burden to prove that the event determined by respondent as effecting the discharge is unreasonable. Cozzi v. Commissioner, supra at 447-448. Based on the foregoing principles and circumstances, we conclude that petitioners had discharge of indebtedness income of $900,000 on December 29, 1994, when the Miller/Huntington Loan was satisfied to that extent by the Rapp Group's payments pursuant to their guaranties.

B. Section 108(a)(1)(B) Exclusion

Petitioners further contend that if they had $900,000 of discharge of indebtedness income in 1994, then they are entitled to exclude it under section 108(a)(1)(B) because petitioner was insolvent within the meaning of that section when the discharge occurred. Section 108(a)(1)(B) provides that "Gross income does not include any amount which * * * would be includible in gross income by reason of the discharge (in whole or in part) of indebtedness of the taxpayer if * * * the discharge occurs when the taxpayer is insolvent". The exclusion afforded by section

108(a)(1)(B) is limited to the amount by which the taxpayer is insolvent.  Sec. 108(a)(3).  A taxpayer is insolvent for these purposes when his liabilities exceed the fair market value of his assets, as determined immediately before the discharge.  Sec. 108(d)(3).

A financial statement of petitioner, prepared as of December 29, 1994, listed total assets of $583,000[31] and total liabilities of $310,000, resulting in a net worth of $273,000.  However, the Miller/Huntington Loan was not included in the foregoing liabilities; instead, it was listed as a "contingent liability" of $1,500,000.  That amount was apparently an estimate, as the parties have stipulated that the outstanding balance on the indebtedness to Huntington was $1,375,000 as of December 29, 1994.

Petitioners argue that the characterization of the Miller/Huntington Loan as a contingent liability on the financial statement was an error, and that it should have been counted as a liability for purposes of determining petitioner's solvency as of December 29, 1994.  If the $1,375,000 outstanding balance of the Miller/Huntington Loan were so treated, petitioner's net worth as

---

[31] The Dec. 29, 1994, financial statement does not attribute any value to petitioner's MMS stock as of that date.  In our view, that characterization is accurate, as an MMS notice to its creditors, dated Jan. 17, 1995, disclosed that MMS's secured debt exceeded the value of its assets, and its unsecured debts exceeded $1,800,000.  Accordingly, we are persuaded that the MMS stock was worthless as of Dec. 29, 1994.

of December 29, 1994, would be ($1,102,000); namely, $583,000 in assets minus $1,685,000 in liabilities.

Respondent, relying on Merkel v. Commissioner, 109 T.C. 463 (1997), affd. 192 F.3d 844 (9th Cir. 1999), argues that petitioner was solvent as of December 29, 1994, because the $1,375,000 balance of the Miller/Huntington Loan was a contingent liability that, given the Rapp Group guaranties and the guarantor waivers, was unlikely to be paid by petitioner. Thus, respondent contends, the balance owed on the Miller/Huntington Loan should not be counted in determining whether petitioner was insolvent for purposes of section 108(a)(1)(B).

We believe respondent misreads Merkel. The contingent liabilities at issue in Merkel were not the same indebtedness that was being discharged, as is largely the case here. To suggest as respondent does that the discharged debt, because it is being discharged, does not count as a liability for purposes of determining insolvency under section 108(a)(1)(B) contravenes the statute's design and purpose. Section 108(d)(3) provides that the determination of whether a taxpayer is insolvent is to be made on the basis of the taxpayer's assets and liabilities "immediately before the discharge." The quoted language evidences an intent to count those liabilities for which discharge is imminent. If one argues, as respondent does, that the discharge of the Miller/Huntington Loan gives rise to discharge of indebtedness

income for petitioner, because the discharge effects a freeing of assets previously offset by the liability arising from that loan, then it necessarily follows that petitioner's liability on the Miller/Huntington debt was not contingent and is to be treated as in existence immediately before the discharge.[32]

We therefore agree with petitioners that the $1,375,000 balance on the Miller/Huntington Loan as of December 29, 1994, should be counted as a liability in determining whether petitioner was insolvent when the discharge occurred, which results in insolvency on that date to the extent of $1,102,000. As the amount of petitioner's insolvency exceeds $900,000, the entire amount of the discharge of indebtedness income is excluded

---

[32] We recognize that the foregoing analysis applies principally to the $900,000 portion of the Miller/Huntington Loan that respondent contends was discharged for purposes of sec. 61(a)(12) in 1994. However, petitioner's liability under the remaining $475,000 portion of the Miller/Huntington Loan, which was purchased by the Rapp Group on Dec. 29, 1994, satisfies the standard set forth in Merkel v. Commissioner, 109 T.C. 463, 484 (1997), for recognizing a liability for purposes of the insolvency exception, because it was more probable than not, immediately before the discharge, that petitioner would be called upon to pay that obligation in the stated amount.

We reach this conclusion based on the following: (i) The Rapp Group purchased $475,000 of the Miller/Huntington Loan (thereby becoming petitioner's creditors rather than guarantors) because it was anticipated that the completion of MMS's outstanding contracts, plus the liquidation of its assets, would result in proceeds of approximately this amount; (ii) petitioner formed a new entity with the Rapp Group, to which MMS's assets and outstanding contracts were transferred, for the purpose of completing MMS's contracts; and (iii) the $475,000 portion of the indebtedness was in fact subsequently satisfied with such contract proceeds and asset liquidation.

from petitioners' gross income under section 108(a)(1)(B). See sec. 108(a)(3).

### C. Tax Attribute Reduction

Any amount excluded under section 108(a)(1)(B) must be applied to reduce certain tax attributes of the taxpayer, including, inter alia, any net operating loss or net capital loss for the taxable year of the discharge and any net operating loss carryover or any capital loss carryover to such taxable year. Sec. 108(b)(1) and (2)(A), (D). Respondent contends that in the event we determine that petitioners are entitled to exclude any discharge of indebtedness income, then petitioners must eliminate their claimed tax attributes as follows: A net operating loss of $163,475[33] for 1994; a net operating loss carryover to 1994 of $238,293; a net short-term capital loss of $5,849 for 1994; and a long-term capital loss carryover to 1994 of $8,194.[34] We agree and so hold.

_____

[33] Petitioners had income from other sources in 1994 that partially offset the $189,845 loss they claimed for that year from their investment in MMS.

[34] The reduction in petitioners' tax attributes for 1994 noted above results in correlative adjustments to petitioners' 1995 tax attributes; namely, the elimination of the $206,178 net operating loss carryover, $5,849 short-term capital loss carryover, and $8,194 long-term capital loss carryover claimed by petitioners for 1995.

Conclusion

We have carefully considered all remaining arguments made by the parties for contrary holdings and, to the extent not discussed, find them to be irrelevant, moot, or without merit.

To reflect the foregoing,

Decision will be entered under Rule 155.